Good morning. Your honors, may it please the court. Conor Woodfin for the Republican National Committee. I'd like to reserve 3 minutes for rebuttal. As a national committee of one of the major political parties in this country, the RNC relies on email to communicate with its supporters, to turn out voters and to raise revenue. Google knows that, but that didn't stop Google from repeatedly suppressing the RNC's campaign efforts in the months leading to the 2022 midterm elections by cyclically diverting political campaign emails to spam folders at the end of each month, month after month for nine months. Judge Calabretta held that Google's actions plausibly amounted to intentional political discrimination. And he held that section 230 was no bar to that discrimination. Those conclusions were right. 230 C1 doesn't apply because the complaint doesn't seek to hold Google liable for harmful content that someone else published, but rather for Google's own actions in suppressing communications. And C2 doesn't apply because the complaint plausibly alleges that Google acted in bad faith in suppressing these emails. The district court... The district court's ruling that this plausibly pled discrimination is something that we would review de novo, right? We're not bound by that as a fact finding because this isn't a stage at which there should be fact finding,  That's correct. It is de novo review. But I would just say that, you know, Judge Calabretta went through detailed findings through the complaints allegations. And, you know, just to highlight a few of those, it's the time that that point to intentional discrimination. It's the timing of these emails. It's the persistent lack of a clear reason. It's Google's knowledge. It's the abrupt end to this months long suppression, which he called perhaps the strongest allegation. It's the fact that no other email carrier did this to the RNC. This was not typical spam filter behavior that the RNC was experiencing, but was an unusual outlier phenomenon. Google has a history of discriminating against Republicans generally and against Republican organizations like the RNC specific. So I think when you say that you're looking at the study from two years earlier that was about candidates, not parties. I'm just trying to figure out the source of my question is, I'm not sure that you have a comparator. Like you don't have something where it's the Democratic Party that their spam didn't do this. You don't seem to have a comparison. So usually in discrimination it's like a similarly situated person was treated better than me, but you don't really have that exactly. And then also this pattern isn't really exactly the same every month. And so it's just a little odd. Like if they really were trying to hurt your emails, it's like, why would you do it this way? It's kind of an odd puzzle. So I'll take those one by one. So first, as far as a comparator, we offer a couple. So first is the North Carolina study, I think it's all the way there, in that it does show that Google was treating Republican emailers differently than emailers from the Democratic Party, from other political parties. So there's your comparator on the left-right spectrum. But also there's another comparator in that Google was the only email service provider that was doing this to the RNC. So you also have a comparator with respect to Yahoo and Microsoft. The Microsoft pattern, though, actually does show something. I mean, it's not exactly the same pattern, but Microsoft was blocking a lot of the email. So the Microsoft filter was at least behaving as a normal spam filter would. It was erratic at some points, but it did not come close to the cyclical diversions that we experienced with Google. Google was dropping all the way down to 0% or 1% delivery. And this was happening month after month. This also goes back to the conversations that the RNC was having with Google. They were stonewalling, cancelling meetings, refusing to address this problem, supplying reasons that the RNC consistently rebutted. And still, as Judge Calabretta said, there is a lack of a clear reason to this day, even in litigation, as to why this was happening from Google. Is that because it's the motion to dismiss stage, though? I mean, how would they give us the reason at this point? So I think this also goes back to your second question, that the fact that this wasn't happening exactly at the end of the month or something, or Google points out, for example, that it wasn't suppressing all of the RNC's emails, so it couldn't be discriminating. That's just not a relevant fact in discrimination cases. I mean, just take the Harvard case, for example. Harvard couldn't avoid a finding of discrimination, even though it was letting some Asian applicants into the school. That's not a defense to discrimination. And so what we're pointing to is the cyclical nature of this. And then also, just returning back to what Judge Calabretta called the strongest allegation, this was happening repeatedly for nine months. It stopped immediately after we filed this lawsuit. That shows that Google has control, that they know what's going on, they knew what they were doing, and that they had an off switch that they could have pressed at any time. They were refusing to do it until we filed this lawsuit. I would like to go to Patsy's discrimination allegations. Judge Calabretta agreed with us here to the Unruh Act, because this is where Judge Calabretta started dismissing our claims, was on these legal findings. And beginning with the Unruh Act, because Judge Calabretta did agree that we plausibly alleged intentional discrimination, really the only question here is whether the Unruh Act protects political affiliation. Before you get to that, isn't the only real threshold question the standing question?   heightened standard under the Unruh Act. So my question really relates to whether you, the RNC has satisfied the heightened standard under the Unruh Act for statutory standing. So we don't think you need to address the statutory standing issue at all. That's because Google never raised this below. This was an argument that the RNC had the opportunity to brief this. Google doesn't seriously defend in their red brief in saying that they argued statutory standing below. Instead, they raised the level of generality to saying, well, we made 12 v. 6 arguments, and this is it. We're reviewing de novo the motion to dismiss. So you can make the arguments now, and we have to figure out if this complaint states a claim. So I'm not sure why that helped. I mean, I understand your objection, but it seems like something that could be addressed by us if we chose to  And we now had an opportunity to address this. So the court could address this, but the Supreme Court and this court have been clear that a party failing to raise an argument below is just waived. And this court, especially courts of appeal, as the issues go up, shouldn't be ready to jump into these new arguments because it violates, fundamentally, the party representation rule. The district court put itself into place of Google rather than the place of the court in deciding this issue to respond to. Well, there's a distinction between waiver and forfeiture, right? A waiver, we wouldn't be able to reach it if it was forfeited, but addressed by the district court. Anyway, and the district court made a ruling on the merits that we, some would argue we are obligated to address the merits because the district court did, or at least that we have discretion. So I don't, you'd have to show that Google waived the issue. All right. Perhaps the best case I have on this is United States versus Sinnon and Smith, which we discussed in our briefs. And in that case, the issue was presented to the district court in an amicus brief, I apologize, to the court of appeals in an amicus brief. The Supreme Court said, nope, that's still not enough, even though the court of appeals was presented with the issue and was able to decide it and it was fully briefed. It was violating the party representation rule because that argument wasn't raised by the parties. And that's the same argument we're making here. I appreciate that argument and I totally understand why you're making that argument. But let's just put that aside.  And address substantively the standing question under the UNRRA Act, if you would. Right. And so the fundamental question under statutory standing for UNRRA is whether the plaintiff has experienced an interaction distinct from merely learning about what the defendant did. And here there's no doubt that's  There's no doubt about that. It's only the RNC who's experiencing, you know, these cyclical diversions to the emails. It affected the RNC personally and its organizational capacity. This was millions of emails to millions of subscribers over the course of nine months. That's the basic criteria that satisfies statutory standing. How does that then intersect with the California case on Thurston v. Omni Hotels, which then talks about if you're an online business, you have to show that the plaintiff has visited the website, encountered discriminatory terms, et cetera, et cetera. And we don't have the RNC doing that. So Thurston focused on a unique relationship between the plaintiffs and defendants. We do think we've alleged enough facts to show a unique relationship between Google and the RNC here. Google relies Can you explain? I understand why you're upset. And you have made, I think, a quite elegant statement as to why the RNC would be affected and taken aback by this. But then how that fits under the UNRRA Act is a different thing. So what is the relationship between the RNC and Google and or Gmail? So it's fundamentally the relationship between Google as an email provider and bulk emailers. So Google relies on these bulk emailers because it relies on its users to, you know, submit personal data. And that's how Google monetizes its product. These bulk emailers, you know, send lots of emails, which generate lots of that  And so that's why Google works with these bulk emailers to develop best practices for them to have meetings with these bulk emailers. Organizations like political committees that are sending lots and lots of emails to their subscribers. And so that's why Google has, you know, it's an interest between the RNC and between Google in making these emails effective for both parties. So that's the unique relationship in Thurston. And, you know, going beyond that the RNC and Google had numerous conversations, emails back and forth, some meetings throughout the course of these nine months. And now we allege that those meetings were unhelpful, that Google was intentionally stonewalling and providing false reasons. The RNC was continually rebutting the reasons. But all of those meetings, all of those conversations demonstrate a unique relationship between the parties that satisfies Thurston. Going also back to, that gets us past statutory standing, I hope, but getting to the merits of the UNRU claim, whether political affiliation is protected under UNRU. Here, it's the easiest way to resolve this is simply look at the California Supreme Court and the fact that it said UNRU protects political affiliation three times. That's well-reasoned dicta that this court has said it's bound to  And if you want to get deeper into the test under Harris, there's no doubt that political affiliation is a personal characteristic, just like religion, age, sex, sexual orientation, or even a person's dress and appearance. Those are all personal  Can I just bring you back for a second to the first point, the statutory standing point? Because Alcorn versus Anbro says you have to be a client, patron, or customer. Do you think, Google, that you are a client, patron, or customer? Or are you saying it's actually a broader test? We're certainly a patron insofar as we're taking advantage of the Gmail service and sending this to Gmail users. So I think we check that box there. The important issue on statutory standing is that we don't read those cases. The obvious satisfaction of statutory standing is a customer or when there's a contract. There's no doubt. Which is why those cases often  You don't have a contract, right? No, no. So we don't have a contract. But that's why those cases often mention that. But just because they mention contracts doesn't mean it's limited to only contracts. We think Thurston demonstrates that. There was no contract in  It was a lady who was trying to book a hotel. So there was no contract yet. The same is true in White. The idea there, I think, some of the cases are about trying to be a customer and then facing the discrimination that keeps you from being a customer. But you are kind of saying you were a customer, except you're saying you're not a customer. You weren't blocked from participating entirely by this discrimination. Well, I would say, again, that just goes back to what it means to state a discrimination claim. We don't need to show that we were incapable of sending any e-mails to show that we were discriminated against. We think that's pretty clear under the discrimination. But you think just by sending the e-mails that the actual customers of Google receive, you, I mean, it does seem to be expanding the UNRRAC in some way. So the reason it's not expanding, and this is, you know, where we go back to White and the reason the court explained statutory standing in the terms that it did is that, you know, it depends on the plaintiff experiencing an interaction that's distinct from merely learning about the defendant's conduct. And here, again, there's no doubt that the RNC was experiencing interactions that were unique between the RNC and Google and experiencing harms that were unique between the RNC and Google. It was a patron of Google Services insofar as it was using... You rely on the word patron. You're not a customer. We think if you're looking... So let me say, you're not a  That's correct, yeah. Not a customer. And there's no account? Correct. Yeah, no contract. So you are a patron. We think insofar as you're trying to fit us in a box of one of those three words, patron is what best fits. And if you could come out of the box, what would be your  So coming out of the box is just, you know, backing up to basic notions of injury. The RNC experienced an injury that was proximately caused by Google's conduct. We think that's the basic test that white sets out. And the RNC is not just a bystander here. It was not merely watching Google discriminate against someone else and now seeking court to redress that injury. It was experiencing this injury as the RNC, month after month. We think those are the basic requirements that get us past statutory standards. I think it's... I mean, I think you're relying on the part of white that talked about differential treatment, right? That has to be personal  But I think the questions that are being asked are more about the nature of the relationship, right? So I think there's, in white, right, the plaintiff had to show that they intended to be a customer because there was no actual transaction. They wanted to differentiate the plaintiff from someone who just is aware of a discriminatory policy. But they didn't say it was  I guess in all the cases cited by white, there was at least an experience of a discriminatory policy. Then I think there is a whole other line of cases about, you know, personally experiencing a construction barrier to access other things. So there's... Where there is no commercial relationship required, just an experience of a barrier to access or discrimination, would that be... I mean, is there any other line of cases besides those construction barrier cases where just experiencing some sort of differential treatment but there is no commercial relationship between the plaintiff and the defendant? Right. So the distinction those cases are drawing is not so much between whether the person was a customer or, you know, some non-customer, I guess. It's the distinction that white is drawing and saying, you know, we're not sure whether the person intended to patronize the  That's more of a causation question. You know, has the person taken affirmative steps to interact with that business? So it doesn't necessarily turn on whether the person is a customer or not. You know, if a person was in a hotel room, in a hotel lobby, was not necessarily a customer of the hotel, not staying in a hotel, but they were kicked out because of their race, there's no doubt that that would satisfy statutory standing under UNRRA. So it doesn't turn on whether the person is contracting with the business or providing money or, you know, exchanging goods with the business. Okay. So I appreciate this. If someone just walks into a free public open area of a hotel and they get kicked out, whether they were a guest or the hotel, it doesn't matter. Do you have any case law that says that's how UNRRA would apply in that situation? I don't have an example of a case for that. We just think it's probably common sense that, you know, a hotel couldn't do that under UNRRA and a person kicked out for that reason, you know, would have standing. So I have some questions about common carrier. We will still give you time for rebuttal, but why don't you just keep answering our questions while we have them. So it seems like you acknowledge that spam filtering is okay to do in some way, and I'm just really struggling with how that fits with your common carrier theory, both because the terms of service say that Google will do spam filtering, so it's not really promising to carry everyone. Also, my additional question, if I can add to, and maybe you can respond in either order, is how would a political theory fit with the idea that there can be spam filtering, because it seems like once you start spam filtering, if we allow this political affiliation or political views idea, then everyone who gets filtered could say it's something about their views that is causing them to get filtered. Right. So I'll do my best to take those one at a time. So first, with regard to spam, how this fits with common carriers, common carriers have always been able to filter out, so to speak, messages, people, packages that are dangerous, harmful, harassing. That is well established in the common carrier law. You don't need to deviate from any of those cases, and so that takes place. The problem about that, though, just to follow up, is that spam is kind of in the eye of the beholder, and Google has to do some guess about what someone else will even think about whether they want this message or not. It's not like everyone understands this package is going to explode. Sure, and I think this probably gets to your second question also, and that's why it's important that we're not asking you to decide what is and isn't spam. That's just not an issue presented in this case. That's a straw man that Google argues against, but it's not our position, and I think this probably fits. But aren't you kind of? Because don't you have to sort of plausibly say that you're not spam? I mean, there has to be some understanding of what spam is for you to not be spam. So what takes care of this for you, at least in this case, is that Google has admitted it has no legitimate business justification for sending these emails to the spam on the basis of the sender's political affiliation. So that concession takes you out of any of the decisions about whether this is or is not spam. Maybe another good example, this is a Section 230 case, but Malwarebytes is a good example of this. In that case, this court didn't have to go into whether the plaintiff's software was actually malware. It was enough that the plaintiff alleged that the real reason that their software was being suppressed was because of anti-competitive animals. And so that's the same as true here. It's the political affiliation animus that's motivating Google that takes you out of any sort of issues about determining whether this is or is not. So would it be a defense for Google to say, to be able to prove our spam filter was just overactive and the political affiliation had nothing to do with it? So that's a defense. We don't think that's a cognizable defense at this stage because, as Judge Calabretta held, we do allege intentional political affiliation discrimination. And so it's that allegation that, at least at this stage, gets you past that defense, but later down the road. Going back to the common carrier, then. You're not a common carrier for all purposes if one is to be a common carrier. So that's just sort of a general proposition that we've had, particularly in federal law. So let's just assume that Google is a common carrier for sending and receiving. And I'm not saying that it is, but were it to be that, for sending and receiving, I'm still having trouble understanding how Google would be classified as a common carrier with respect to display of the user's email, because that's taking it a step differently than one might think of common carriers moving things. Right. So we don't think the common carrier analysis really turns on whether these emails are like how they're packaged and how these packets are sent around. And what matters is that Google offers to carry these emails for the people who sign up and check the box on its terms of service. And that's just how people understand email to work. When you sign up to use Gmail, you're signing up for a service that allows you to send and receive messages. But isn't the spam filter optional for the Gmail user? So, I mean, it's as if I told the post office, please keep all that junk mail away from me as like an extra service. Right? Like, I mean, they do deliver all my mail, but if I had the option to say, you know, keep all the grocery mailers away from me, right, and then there was some extra service of sorting them that I chose. But I could also say, don't filter them out. So that's the problem with Google's conduct here, is it actually doesn't depend on what individual users are checking as spam and not. As we allege in our complaint, everyone receiving these emails is someone who not only has signed up to receive them and wants to receive them, but who has recently and actively engaged with the RNC's emails. Well, that's a different question. I guess to me, don't I have the option to just not turn on the spam filter?  As an email user. I'm not sure whether an individual user can just turn off the spam feature entirely. Well, maybe an easier way to put it, though, is it is there. I mean, you can go and look at the spam. So they did get the message. They just have to go to a different folder to see it. Sure. And, you know, a column carrier doesn't discharge, you know, her obligations by delivering the newspaper into the garbage can. It's still delivered. It's still there. But it's more likely that the, you know, the person who's receiving that newspaper is not going to look at it and is going to throw it away without ever seeing the message. You have to have some relationship between the carrier and the passenger, so to speak. And that seems to be what's missing here. You know, that's probably... It would seem that someone has standing to bring that, for  And then we would see whether or not that's what it implies. But I don't quite understand how the RNC fits in that construct. So we think if anyone has standing, it's the RNC because it's the organization that is suffering the most from this content, from Google's conduct. Google's... Well, that's a different question from whether there's a classification as a common carrier. I mean, you might have standing for all kinds of claims, but with respect to the common carrier claim. So I guess I view this standing issue, the harm to the RNC, as a separate question of whether Google is a common carrier. Correct. But perhaps the way they're related is that because Google is a common carrier, it owes a duty to carry messages without regard to the person's race, sex, et cetera. And arbitrary, intentional discrimination violates those duties. We don't think that's a  The real question is whether Google's a common carrier. And we think because Gmail operates inherently as a service designed to carry messages, that's why people sign up to use email. That's what makes Google a common carrier. Thank you. We've taken you over your time, yes? Thank you. Okay, we'll give you some time for rebuttal, but let's hear from the other side. May it please the court, I'm Michael Huston of Perkins CUNY for Google. Gmail's spam filter works by interpreting user signals to predict which emails a particular Gmail user is likely to consider spam.   Gmail never takes account of a sender's political viewpoint. But the more important point at this stage of the case is that as the district court correctly recognized, the RNC is here asking this court to expand the scope of multiple California causes of action in ways that no court ever has before. There's no reason for the court to certify the case to the California Supreme Court because although the RNC's claims fail, they fail for multiple independent reasons. The RNC's theories of California liability lack any support in precedent. The RNC has not identified a single case from California holding that an email platform like Google is a common carrier, that political viewpoint is always and everywhere an arbitrary and invidious classification in California, or that email senders whose messages get filtered to one segment of the Gmail inbox rather than the other have the right to come into a federal court and challenge Google's classification of those messages as spam. I think the court should be especially reluctant to embrace those expansions of California law because of their dramatic potential to affect the way in which email service providers provide a tool, spam filtering, that Congress has expressly endorsed and that just about everyone who uses email understands is a valuable public good. Some political campaigns and retailers send multiple emails per day in peak season, and if this court holds that there is a viable cause of action that allows a sender whose email messages are designated as spam to come to court and say, no, those messages actually were not spam, and the only opportunity that Google or any other email service platform is going to have to rebut that allegation is going to be we're going to have to go through discovery. We're going to have to get to summary judgment. I think the net effect of that is that senders are going to unleash an avalanche of emails on users, and that is bad for everybody. In addition to those problems, the claims here fail under Section 230, and they are implausible under the Twombly and Iqbal standard because they're refuted by the complaint's own allegations in multiple respects. Can you start with some more detail on that last point? Why do you think that the discrimination claim isn't plausible? Certainly, Your Honor. So again, I think that at this stage of the case, it's just refuted by multiple other allegations in the complaint. The theory being that the reason why Gmail sent these messages to spam was exclusively because of the sender's political viewpoint. So let me give you just three things. I think there are several that are discussed in the brief, but three of the most obvious allegations in the complaint that refute that theory. The first is the A-B test. So in the amended complaint, the RNC says, we ran a test to try to figure out what was causing our messages to go to the inbox versus the spam folder. And as they describe it, the test there showed that the exact same message both from the RNC with almost the same content, one message went to the inbox, one message went to the spam folder. According to the RNC's own allegations, the only difference between those was the kind of information that the one message that went to the spam folder asked for from the user. It asked for more personal information like a cell phone number. That allegation powerfully rebuts the idea that the reason why emails go to the inbox or to the spam folder has anything to do with the fact that it's the RNC sending them or anything about the RNC's political viewpoint. Because in both messages, one going 100% to spam, one going 100% overwhelmingly to the inbox, the political sender is the same, the political viewpoint is the same. Second key point about that. Sorry, maybe correct me if I'm wrong, but don't they say though that their emails were not really different at the end of the month? And so that doesn't, I mean, I'm not sure how that explains the pattern of this end of the month blocking. Sure. So going to the end of the month specifically, and again, I think it's important to be specific about what the complaint alleges. As I think some of Your Honor's questions indicated to my friend, the RNC has tried to plug this crucial hole in the case of why, if Google is interested in discriminating against the political viewpoint of the RNC, why is it only doing so for one or two days a  The latest theory that the RNC has is, well, those were the days that Google supposedly knew at the end of the month that fundraising is most successful. But look at the specific allegations in the complaint. In February 22, the dips happened on February 2nd and 3rd, and February 20th and 21st. In March, it's March 24th, but the inboxing rate recovers by March 26th. In April, it occurs April 25th, recovers by April 27th. And in June, it's on April 28th, recovers by the end of the  Those are, I think, important allegations because in March and June, in addition, those are not only end of months, but end of quarter periods. So according to the RNC's own complaint, these dips are not actually happening on the last day of the month. Sometimes they're happening in the middle of the month. Sometimes they're happening sort of two-thirds of the way through the month. It just doesn't, you know, again, I think judicial experience and common sense. Step back and look at the specific allegations that the RNC has made that when these dips occurred, and ask yourself if that can just, what can plausibly explain that? The thing that can, the obvious alternative explanation other than political viewpoint discrimination, is that as Google told the RNC when this was occurring, quote, a lot of email users are marking your messages as spam. I think this is the other point to your question, Judge Friedland, about the allegations in the complaint that undermine the plausibility. The RNC's allegation is that throughout the nine months where this problem was occurring, their average spam rate was .14%. And then I would urge the court to take a look at what Salesforce, the RNC's own vendor that the RNC alleges it relied on to follow best practices, says about that. Quote, the limit for spam complaints is 0.1%, and spam complaints have a lasting negative impact. So the obvious alternative explanation, according to the complaint's own allegations, is that the rate at which Gmail users were marking the RNC's messages as spam was 40% higher than what the RNC's own vendor said should be, quote, the limit. So how do we deal with the problem that it ended when they filed this lawsuit? So, Judge Friedland, I think that the other important point that undermines the plausibility of these allegations, and which goes directly to that, is that the RNC alleges, because it's true, that Google repeatedly worked with the RNC throughout these months in an attempt to solve the problem. I would urge the court to take the... So are you saying that it's just a coincidence? I mean, so because it kind of cuts both ways. If you were really working with them, you knew they were having the problem, and yet it didn't stop. But then when they filed the lawsuit, it does stop. I'm not quite sure what to make of that. Is it like you're saying it just happened, that when you finally figured it out, it happened to be when the lawsuit was filed? I think that the inference that the court can draw from the bare fact that the last time this occurred was allegedly the end of September 2022, and then they filed their lawsuit in October 22, the most that you can get out of that, given all the other allegations, is that Google was trying to work with the RNC to solve this problem and successfully solved it. And I just want to focus on one thing for a moment, one allegation in the amended complaint. It's not just that we allegedly like sent them some emails with some suggestions for how they might improve it. The allegations are that in August of 2022, just about a month and a half before the problem ceased, the RNC... Excuse me. Google went in person to the RNC to deliver a training on best email practices. And again, just ask yourself, have you ever heard of a situation where an entity is engaged in active, intentional discrimination, and yet it's coming to the victim of that discrimination and giving a training on how to improve their practices, which the RNC alleged in their original complaint had quote, a significantly positive impact on the deliverability of their emails. Part of this argument kind of reflects, you know, a differing view of the inference from the  And the question is, we're now at the motion to dismiss stage. We're not weighing those facts, or the court is not weighing those facts. So how does that play in to what I think is your overall argument that the complaint simply hasn't alleged enough to state a claim? I think the court should focus on two points, Judge McEwen. The first is that, again, the RNC is here alleging a very unusual theory of discrimination. Supposedly, Google wanted to, you know, frustrate the RNC's political viewpoint, but only for one or two days a month. That's not the kind of discrimination theory that the court would typically encounter. And I think that that comes, if that's going to be the RNC's claim, they have a burden to actually justify why that would make sense. Why would Google do that? The allegations in the amended complaint about us giving them an active in-person training about the AB test all undermine the plausibility of that claim. And then I think the second point is the one that Judge Friedland recognized and pointed out to my friend, which is the absence of any kind of a  The RNC has not even alleged that the Democratic National Committee, or major Democratic political candidates in 2022, did not experience major drops in their inboxing rate. They can't do it. They can't do it consistent with Rule 11. And so that is yet another factor that I think seriously undermines the plausibility of these allegations. And then I think just for good measure, the complaints own allegations about the behavior. Can I stop you on that for a  Is it reasonable to expect them to? I mean, if it's a workplace and you know who the people are who are getting promoted, you know how to compare, but would they have the access to the information about the Democratic Party? Well, I think, Your Honor, I'm not sure whether they do or they don't, but they're obviously the plaintiff. It's their burden to come forward with allegations that plausibly substantiate discrimination. And again, I just come back to this is a very, very unusual kind of discrimination. This is not like somebody in a workplace who's saying, hey, I was paid less than my male counterparts doing the same work or something like that. Just a very, very strange theory. And one of the ways in which I think you can have additional confidence that these allegations are refuted by the plaintiff is the chart describing the behavior of their inboxing rate on another email service platform, MSN, where you see multiple drops of 50 percentage points or more, including if you look at the end of that chart in the briefing right before the 2022 election, you see a massive drop on it. And you're focusing in a way on the toughest issue for you because of our motion to dismiss standard and how we have to draw inferences in favor of the plaintiff. I would like you to spend a little time on the common carrier issue. I'm more than happy to do so, Judge Sung. I think that the implications of the common carrier argument are really quite radical. I am not aware of any court decision anywhere in the country holding that an email platform is actually a common carrier. And I think there are just several elements of why, in fact, I think almost every element of being a common carrier, that the RNC fails. The first one is, the first sort of fundamental problem is a common carriage obligation would render all spam filtering unlawful. And I think, Judge Friedland, you asked my friend about this. I didn't hear any answer that gives me comfort as a lawyer for Google that if this, that Google, if it were held to have a common carrier obligation, could engage in spam filtering for the benefit of users. Spam filtering obviously is essential to protect email that is illegal or that is, you know, a fraudulent or a malware or something like that. But everybody who uses an email inbox knows that that's not the limit of what constitutes spam. And just because you signed up, you bought something from a retailer at some point, or you're interested in receiving some emails from a company, doesn't mean that you want that 12th or 20th email that they've sent you this month. Juvenile users mark those messages as spam when they've just had enough of this particular sender. And that is, as the Gmail program policies specify, incorporated by reference into complaint, that user input saying, we, I just want to see, I want to see fewer of these emails coming from this sender is the most important factor that the algorithm uses to sort messages. So... I want to separate then the user and the sender, if I may, in this common carrier argument. You're now talking about the user being able to check boxes to basically, I guess, disaggregate and to have personalization of your spam, if you will. So... Under Google's terms and conditions, what is the obligation that Google has to actually deliver email that is sent? Well, I think I would say two things about that, Judge McEwen. The first is that the Gmail terms of service are quite clear that the way in which we are going to present your emails to you is sort of fundamentally inconsistent with what a common carrier would have to do. A common carriage regime is a way in which you deliver everything generally and indiscriminately. Google says exactly the opposite. We don't promise to deliver all email that comes in generally and indiscriminately. Quite the contrary. We say we are going to use algorithmic tools to sort out messages that are considered to be spam. We're going to make a prediction about what you want to see in your inbox. And on the basis of that prediction, we're going to deliver some of your messages to the inbox, some of them to the spam folder. So that's the receiver of the messages. So now let's talk about the sender of messages. What's Google's relationship to the sender of messages? Your Honor, as a matter of law, there isn't one. And this is, I think, there isn't just no relationship whatsoever. This is, I think, yet another fundamental problem with the idea that there could be a common carriage regime. It's well settled in the law that common carrier duties run to customers. The RNC is not Google's customer. They don't, as the court heard this morning, the RNC doesn't sign up for an account with us. We don't have any kind of contract with them. Does Google want to see the RNC able to deliver its messages successfully? Yes, because we want our users to have a positive experience. So that's why I think it's Google works with the RNC to say, here's how we can give you and all others. The bottom line is there is no relationship, legal, between Google and the sender. That's correct, Your Honor. There is no relationship. And the RNC has identified no case that even comes close, I think, to holding that this kind of the relationship between Gmail and the senders of email could give rise to the kind of customer relationship that would be necessary to establish a common carrier duty. Could you respond to the UNRRA act hypothetical about the hotel lobby and someone kicked out because of race? So, Your Honor, I think, yes, I'm happy to do so. The Thurston case, which Your Honor mentioned, refers to a person who either is a customer or has a bona fide intention to become a customer. I think somebody who comes into a hotel lobby and says, I'm here to, you know, use the coffee shop, or I'm here, I might be checking in. Here, I want to, you know, have a drink at the bar. That person absolutely is intending, has a bona fide intention to become a customer. I agree that under California law, that person could not be thrown out solely because of their race. But they're kind of just... What if they're waiting for a friend who's staying at the hotel? So, I mean, I'm not sure, Your Honor, if they say, it is my, if they disclaim any intention to have a relationship, you know, with the business. I don't know, honestly. I think it's murky under California law, but it just goes back to the fact that the RNC has an identified cases that clearly substantiate the recognition of a customer relationship in that situation. And certainly, you know, I think we have to hesitate about taking analogies from the physical world and importing them directly into the digital world. I don't think that, you know, the RNC is alleged to just be a friend of a Gmail user who is, as we know from the complaint zone allegations, Gmail users are routinely marking RNC emails as spam at a rate that exceeds what should be considered the limit. So, when I look at this complaint, I see Google attempting to put itself into, you know, I think they disclaimed being a customer today. What about this idea that they're a patron? I think if you, that's, it's a strange conception of patron, in my view, to say that the RNC is Google's patron. I just, if I, you know, if you look at the dictionary definition of patron, which I don't have in front of me, but certainly that's not what I think Google provides Gmail as a benefit for its users. And so, everything that Google does exists so that Gmail users will have a more satisfying email experience, including both the provision of the spam filter, including the ability of users to designate messages that they want to receive or that they would prefer to receive fewer of. So, you're obviously exceeding your time, but then we also were generous with the RNC and I'm sure it will all balance out in the end. I don't want you to leave before you address Section 230 and particularly C2A with respect to the plausibility of an alleged discrimination. So, does the applicability of that section of Section 230 depend on whether there's a plausible discrimination allegation? I don't think it entirely depends on that, Your Honor. In this respect, when the court is applying C2A, as the Ninth Circuit's precedents reflect, this is an immunity provision. Congress wanted to provide not just an immunity from ultimate liability, but immunity from suit. That's roommates.com. When you have a statutory provision like C2A that clearly exists in order to immunize things like spam filtering, so long as it's done in good faith, I think that just means that where we're talking about an immunity provision, I think it means that the RNC has an especially heavy burden to plead to overcome good faith. It can't just be that they get to come into court and say, yes, our messages were marked as spam, but they didn't actually constitute spam, and so it was done in bad faith. If that were enough, then everybody who has their messages filtered and sent to spam would be able to plead that cause of action, and Section 230 would be effectively rendered useless. Sorry, I'm trying to understand your answer. Are you saying that discrimination on political terms would be bad faith, but they need a heightened pleading standard like we have for  No, no. I think what I'm saying is I think I'm trying to make two different points, Your Honor. I think in the first instance, I just think that where you're applying an immunity provision and a good faith requirement, the RNC sort of bears a heavy burden to plead allegations that plausibly establish the evidence of good faith. We've spent obviously time this morning. Okay, let's say they have, they do have the comparison, they have the two parties, they're worse, they have everything that you say they don't have. Would that then defeat your immunity under C-2A? No, it wouldn't. This is the second part of my answer. But before you go to the second part, you've talked about this heightened pleading standard, and what's the basis for that under C-2A? The fact that it's an immunity provision, Your Honor. So simply because of the nature of immunity from suit? Yes. Because it's an immunity from suit, that's where, yes, that's my answer to that. And then I think to your question, Judge Friedland, you know, it's simply not true that no business has a business justification for taking account of political viewpoint. Now, we don't. As we've said throughout the case, Gmail does not operate by taking account of a sender's political viewpoint. But if you're going to recognize a cause of action that would allow, you know, senders of email to come in and leverage and make that objection and say we should be able to get discovery into why Google or MSN designated our messages as spam, I think that's going to have really drastic implications for the volume of spam email that gets sent out. And I think that we certainly do have a very strong business So what would good faith be then? I mean, are you saying that a political view could never have anything to do with the good faith analysis? No, no. On the contrary, Your Honor. I think there are certain instances where it could, hypothetically. I think that it would be reasonable for an email platform to say we have internalized our users' preferences. We note that this particular user, it sure looks like the emails they're most interested in receiving come from the RNC and President Trump and Republican candidates. And on that basis, we're going to make an inference that messages sent by Congresswoman Ocasio-Cortez, probably this user considers spam. Now, I just want to be clear, Google doesn't work that way. But hypothetically, it would be perfectly reasonable, I think, for an email platform to say we're interested in, we want to take account of a sender's political viewpoint because we think that's relevant to what our user wants to see. And that just reinforces, I think, the fundamental problem with expanding California law to recognize this new theory of liability that would allow anybody to come in and say, well, although you filtered my email, you did it in bad faith. If I understand you correctly, you're essentially saying the spam filter is a service you provide to a Gmail account holder. If they choose to use Gmail as their email service, and they, I mean, in theory, they could choose if they wanted a more, a political filter. Say someone could advertise and say, we'll filter your emails this way, and the customer could just choose that filter and then that should be okay.    If the customer themselves is saying, please filter all these emails from my account. Yes, I agree with that, Judge Sung. I think, absolutely, your fundamental point is spot on. The Gmail, sorry, the spam filter is a service that Gmail provides for the benefit of users. And as the documents that are incorporated by reference into the amended complaint reflect that, the signals that the Gmail algorithm bases its filtering decisions on come from users. Whether they mark messages as spam or whether they say, I prefer to receive these messages. I want them added to my, I never want messages coming from a particular sender to be received as spam. Those are the most important signals that the filter uses. So let me just understand, you're saying that the algorithm is essentially trained on users' preferences? Or no? Yes, I think that's correct, John. I mean, it's obviously trained on other things, too. But the most important signal that the algorithm uses to make a predictive judgment about whether you in your inbox want to see a particular message in your inbox or in your spam filter are the signals that you as a user have sent to Gmail about other messages. But does that then extend more broadly to the broader spam filter algorithm? Not just a single user, but the amalgamation of users? Yes, of course the algorithm takes account of signals from many millions of Gmail users. So let's say millions of users say, I don't want any of these DNC or DNC-related emails to come to my account. And 90% of the Gmail users said no more of these Democratic emails basically trashing up my account. Then you're saying that the algorithm as a whole would possibly literally block all of these. I don't want to go that far. Potentially could. Even then, I think even then, in the case of users of Gmail who do want to receive those emails and have signaled to Gmail, maybe I'm in the hypothetical, but I would like to receive emails from the Democratic National Committee, the algorithm is going to treat that as the most important preference. I'm trying to distinguish between customer preference, but of course Google's implementation of customer preference and where political discrimination may or may not come in there. Well, what I think, what I understand that sort of, that inquiry, Judge McKeown, but what I come back to is it means that if Gmail did this wrong, if Gmail's getting it wrong by hypothesis, the person who is harmed by it is the email user who says, I actually wanted to receive those messages and you didn't deliver them to me. I think that just highlights another sort of glaring defect in the RNC's complaint, which is there are no Gmail users here. Nobody is here claiming, I would have donated to the RNC at the end of the month or at the end of the quarter if only this email had gone to my inbox rather than my spam folder. So, again, everything, this is not just like take my word from it. It comes out of the allegations in the amended complaint and the Gmail terms of service and program policies that are incorporated by reference. We tell users, we tell senders, we tell everybody that the way that the filter works is by analyzing user preferences about which emails they want to  And when you're... And you say you tell senders, but you just told me you don't have any relationship with senders. We don't have a legal relationship with them. And that's right, Your Honor, but again, we want the RNC and every other sender to be able to get messages into the hands of the users who want to receive them. I think it would be very strange if our efforts to try to work with the RNC to give them advice about how to do email sending best practices were held to actually be the thing that creates a relationship, creates statutory standing under UNRRA. That would, I mean, to me that would suggest we had an interest in not giving that kind of advice, and I don't see how that's good for anybody. If I understand you correctly, you're essentially saying we have this customer base of millions of people who have picked Gmail to be their email provider, and then you as, say, to the world generally, if you want to reach our customers, here's what you have to do. I think that's basically accurate, Judge Sun. Yes, I think that's a characterization, and that, I would just say, the ability to have that filtering is essential to everybody who has an email inbox because everybody is familiar with the experience of signing up for something one time or buying something one time and then being a little sick of the volume of the solicitations that they sent you. That's what this spam rate reflects here. I think I should cut you off because we've taken you way over your time. Thank you for the helpful information.  We have three minutes on the clock for rebuttal, please. Thank you, Your Honors. I appreciate the time. Just a few points on rebuttal. Beginning with the Unruh Act, courts have been clear that the Unruh Act is broad. Statutory standing under the Unruh Act is broad. The California courts have been consistent about this. Before I move on, I would like to briefly address certification, noting that the Unruh Act is broad.  been consistent in that. For our part, we think the Unruh Act, if the court were to certify, would be the best candidate for that, both on whether political affiliation without a business justification is covered and on the statutory standing issue. We think California law is clear enough and the well- reasoned dicta is clear enough that you don't need to certify. But for our part, the Unruh Act would be probably the best candidate for certification. You're not necessarily advocating that. No, and that's because we rest on the arguments in our briefs and we do think the California state law is clear enough. Going back to the standing issue, my friend on the other side says that at least some of these standing issues under Unruh are murky under California law. We've given you now three reasons to rule in our favor on at least statutory standing under Unruh. One is that Google waves this, never raised the argument in  And two is we think the law is clear enough. We do have statutory standing under the act. And three is we think it's at least murky enough, as Google seems to acknowledge, that at a minimum you would probably have to certify this to the California Supreme Court. Moving on to your... Let me just ask a question there. Presumably, though, if we were to certify to the California Supreme Court, we would want to reach the section 230 claim, correct? Because California Supreme Court, if it received a certification, would be kind of shaking its head. But what if there was immunity? What are you asking me to do here? I realize if there's not immunity, then I might need to I, we, the California Supreme Court might need to certify it. But what's your position on sequencing? Were we to certify to the California Supreme Court? That's probably fair. I don't know that it's necessary to reach 230, but I understand as a matter of judicial efficiency that that might be the best course of action, reach 230 and then certify any uncertainty under state law. On 230, I would just note that Malwarebytes does not set a heightened pleading standard for bad faith. The case is very clear about that. And then finally, just to address these arguments on plausible alternatives, we don't need to show you what the DNC was doing with its emails. You know, my friend on the other side says this is not the usual kind of discrimination, but this is exactly the kind of discrimination outlined in the North Carolina study and in recent congressional reports that came out just a couple weeks ago about Google suppressing conservative content. The bottom line is that Judge Calabretta's opinion cuts through all of those plausible alternatives. You know, he says on, this is on page 10 of the record, that overall, while there may be technical reasons to account for the abrupt end... Sorry, could I ask a question about the colloquy about this users... So on this hypothetical of, like, most users say they don't want the Democratic Party's emails, and so then the algorithm picks that up and thinks that these are spam. If it was that, so, I mean, just maybe we're getting ahead of ourselves, but if it's the algorithm is somehow just picking up popularity and whatever the popularity analysis happens to have hurt your client, is that discrimination? So, two points on this. One, still yes, because Google is still responsible for the algorithm. It can't just hide behind the fact that it's, you know, some computer that's doing this and not Google who controls whatever is doing this. But second, and this is more fundamental, that just fights the allegations and the complaint. We allege that the customer complaints were low, that this was not a spam rate issue. We went back and forth with Google for months. We rebutted every one of those allegations. And this was... I guess the question is, though, is that the relevant allegation? I mean, if the algorithm is training on the whole Gmail user base, then whether the people who had these filtered were, I mean, you may say these people wanted it, but somehow it got filtered because of what other people thought or something. Isn't that kind of what maybe they're saying? So, I take it that that's what Google is arguing. Even if that is a reasonable explanation for what's going on, it doesn't defeat the plausible inference of discrimination that arises from the facts we've alleged in the complaint. And that's Judge Calabretta's basic point. That while there may be other technical reasons to account for the abrupt end to this month's long inboxing pattern, the timing and the lack of a clear reason for the monthly diversions means that our allegations that Google acted without good faith, you know, plausibly alleged. And what you envision when you have that allocation is that like some person at Google typed in filter extra these days. That's what you mean by the intentional discrimination. So, we think the abrupt end is the best indication that there was a binary choice by Google to just stop this from happening. That this isn't just, you know, some algorithm running wild. Google has control over what's going on, and it was able to  And that was something like never mark RNC spam that they did once you filed suit in your review. So, we don't know what the command prompt is that caused this to stop. We just know it did stop. Google was behind it. It's in control. That's enough to show intent as Judge Calabretta. The inference has to be not only did they figure out how to stop it, but they knew all along. They knew how to stop it before, and they intentionally chose not to. And then when you filed suit, then they chose to, right? If it was any other scenario, right, it could be a defense as a factual matter. I understand you're saying on the pleadings, we can't resolve those factual disputes. But if it went past this and Google somehow showed, we proved we just, it's just that we figured it out, right? You know, we would never intend it. I mean, you would, the inference you're asking us to draw could be disproven if there was a factual trial down the road. That's exactly right. We're not proving discrimination. We're alleging it. Okay. Thank you. Thank you both sides for the helpful arguments in this complicated case. This case is submitted.
judges: McKEOWN, FRIEDLAND, SUNG